Walkup Company v. Commissioner.
Walkup Co. v. Commissioner
Docket No. 11365.
United States Tax Court
1948 Tax Ct. Memo LEXIS 249; 7 T.C.M. (CCH) 57; T.C.M. (RIA) 48021; February 20, 1948
*249 Bayler Kohlmeier, Esq., and George H. Koster, Esq., 300 Montgomery St., San Francisco, Calif., for the petitioner. Leonard A. Marcussen, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined against petitioner the following deficiencies in tax for the fiscal years ended March 31, 1943, and 1944: Declared Value
Excess Profits
Excess
Year
Income Tax
Tax
Profits Tax
1943
$1,295.77
$23,449.95
1944
$307.66
24,593.09 The Commissioner reduced a claimed deduction of $20,000 paid as salary to petitioner's managing president and sole common shareholder to $5,000, determined as reasonable compensation for his services. Petitioner assails this determination and claims further the right to deduct in 1944 a California franchise tax for 1945 based on income of 1944, and proposed but unassessed additions to such tax for 1944 and 1945, which additions it contests. Findings of Fact 1. Petitioner, a California corporation with principal office at San Francisco, California, filed its income tax, declared value excess profits tax and excess profits tax returns for the fiscal *250 years ended March 31, 1943, and 1944 with the collector of internal revenue for the first district of California. It keeps its books and prepares its income tax returns on an accrual basis of accounting. Petitioner was incorporated on April 10, 1937, by Ward G. Walkup for the purpose of acquiring and holding real property and improvements thereon. Its capital stock of $150, represented by three shares of $50 par value each, was issued for cash to Walkup who has owned them ever since. Walkup has been continuously petitioner's president and a director. In 1906 Ward G. Walkup, then 18 years of age, began a drayage business in San Francisco, using one wagon and two horses. Four years later he was operating with additional wagons and 25 horses, and in 1920 replaced horse-drawn wagons with motor trucks. The business developed by him expanded continuously, and incorporated as the Walkup Drayage & Warehouse Co. (hereafter called Drayage), is at present the largest of its kind in the San Francisco area. During the taxable years Walkup owned all of its outstanding common stock, but had no interest in or control over its preferred shares, which during those years were outstanding in amounts *251 varying between $67,000 and $43,000 par value. In 1935 Drayage acquired and has since owned all stock of the Merchants Express Corporation (hereafter called Merchants), a company which was engaged in the drayage business at Oakland, California, and was in the hands of a receiver. Walkup individually acquired all stock of Vallejo Express Co. (hereafter called Vallejo), owning it during the years 1941-1944, inclusive, and all the stock of the Belshaw Warehouse Co. (hereafter called Belshaw), owning it during the years 1942-1944, inclusive. During the years 1942-1944 he was president and a director of Drayage, Merchants and Belshaw, and he actively managed the business of Drayage, Merchants, Vallejo, Belshaw and petitioner with the assistance of three others who served as officers and directors of the five companies and who were assigned to the supervision of different branches of operation. Walkup himself, however, retained all control, made all final decisions, and worked long hours, devoting to the affairs of each corporation the time which circumstances required. Walkup was prompted to organize petitioner as a result of the acquisition by the City of San Francisco of properties *252 needed for a terminal of the Bay Bridge. The properties acquired by the city comprised a garage and lot used by Drayage for the parking of its trucks. In pressing Walkup to vacate the premises quickly, the city official called his attention to a tract known as the Wieland Brewery, which might serve his company's needs. While this property contained only dilapidated, unused buildings, some damaged by the earthquake and fire of 1906, and had been on the market for years, Walkup decided after an inspection that he could erect improvements suitable for Drayage's use and decided to buy it. On being advised by his attorney, however, that approval of the California Railroad Commission would be necessary for such a purchase by a drayage company, he organized petitioner to acquire, improve and hold this and other properties. Petitioner purchased the Wieland Brewery in April 1937 for $170,213.30, paying the purchase price by a loan of $135,000 from the San Francisco Bank, a loan of $17,000 from Drayage and the assumption of certain obligations of the vendor. Walkup then began the demolition of several old buildings on the property; had a spur railway track laid; constructed an office; built *253 a brick warehouse with basement and six floors; reconstructed another with basement and three floors; installed elevators; paved the yard; erected new fences and gates, and made other miscellaneous alterations, all at an aggregate cost of $108,162.10. To finance these improvements, petitioner borrowed the necessary funds from Drayage and from Central Bank, Oakland, and on March 23, 1939, paid off all its indebtedness to banks and the obligations assumed by it with the proceeds of a $200,000 loan from San Francisco Bank. In December 1940 petitioner purchased a warehouse made of structural steel and reinforced concrete, located at 646 Folsom Street, San Francisco, and known as the Roebling Building, for $173,133.11. This property had been on the market for years. To finance its purchase, petitioner borrowed $40,000 from Drayage and $287,000 from San Francisco Bank, paying off $157,252.56 still due on its prior note. In 1941 it installed a freight elevator in the building at a cost of $19,365.50. It borrowed additional funds from Drayage, and on March 31, 1941, its total indebtedness to Drayage was $131,600. In June 1941 petitioner purchased property at 246 Second Street, San Francisco, *254 known as the Canon Kip property, for $7,406.50, and in July 1941 purchased a 7-acre tract on Wood Street, Oakland, for $144,756.07. The latter purchase was necessitated by port improvements of the United States Government which hindered Merchants' operations from its leased premises in Oakland. The Wood Street property contained dilapidated buildings with rotting floors, and required much improvement to be of use. Petitioner demolished the old structures and erected on it a freight terminal, office building, and gasoline storage tank; paving was laid in the yard and a spur track was constructed, all at a cost of $200,227.89. Petitioner made additional loans from San Francisco Bank to meet these costs, and on December 9, 1941, owed the bank $550,000. In July 1943 petitioner purchased property at 37 Hawthorne Street, San Francisco, for $20,248.68. All of the above properties located in San Francisco are contiguous and all located in Oakland are contiguous. Petitioner received a deed to each, and to secure loans gave mortgages on the properties to the San Francisco Bank. After making substantial improvements, petitioner leased the properties, and during the fiscal years ended March 31, 1943, and *255 1944 received rents from tenants as follows: Property
Lessee
Rent 1943
Rent 1944
Wieland Brewery
Warehouse
Belshaw
$20,100.00
$18,000.00
Terminal rights
Merchants
3,000.00
3,000.00
Remainder
Drayage
45,000.00
45,000.00
Roebling Building
Drayage
24,000.00
24,000.00
Canon Kip Property
Canon Kip
35.00
Wood Street Property, Oakland
1515, 1527 Wood Street
Moore Drydock Co.
6,750.00
9,401.59
Remainder
Merchants
49,200.00
48,000.00
Hawthorne Street Property
Drayage
600.00
Total Rents received
$148,085.00
$148,001.59 The cost of the five properties and improvements on them was as follows on March 31, 1943 and 1944, respectively: Property
Cost 1943
Cost 1944
Wieland Brewery
$278,375.40
$278,375.40
Roebling Building
192,498.61
192,498.61
Canon Kip Property
7,659.28
14,195.26
Wood Street Property,
Oakland
346,968.96
352,156.54
Hawthorne Street
Property
22,323.33
Total Cost
$825,502.25
$859,549.14
In choosing, purchasing, financing and improving the above properties, Walkup acted for petitioner, using his own initiative and judgment. He engaged architects for the preparation of building *256 specifications; consulted engineers about demolitions, reconstructions and alterations, but in general the plans were formulated by him and the improvements were his ideas. He conducted negotiations for purchases, sometimes through brokers, and personally handled financing with the banks. Under Walkup's direction petitioner's acquisitions were converted from dilapidated and neglected sites into properties well fitted for their best use. His competence in this respect is recognized in banking and business circles, and after improvement the properties were appraised for bank loans at amounts in excess of total cost. Walkup was petitioner's only salaried employee. He gave to petitioner's business such time as he deemed necessary, and during the taxable years ended March 31, 1943, and 1944, he looked after its properties, rent collections and obligations. He personally negotiated for purchase of the Hawthorne Street property in July 1943; arranged for certain minor improvements on it costing $2,074.65 and also for minor improvements and repairs on other properties. In the fiscal year 1943 these involved a cost of $5,552.21; in 1944 a cost of $19,925.21. The improvements comprised the *257 installation of sheds, walls, paving, rolling doors, spur track, toilet fixtures, etc. Walkup intended to enlarge petitioner's holdings and since the taxable years has acquired for petitioner additional properties. The value of its total holdings is now about two and a half million dollars. For his services Walkup received the following salaries from petitioner, Drayage and Belshaw: Fiscal Year
Petitioner
Drayage
Belshaw
1938
$10,000
$25,000
1939
5,000
25,000
$2,400
1940
7,500
30,000
2,400
1941
7,500
30,000
2,400
1942
30,000
2,400
1943
20,000
30,000
2,400
1944
20,000
30,000
2,400 Merchants paid him $1,844.50 in 1944 but nothing in prior years; Vallejo paid him no salary. The Commissioner allowed petitioner to deduct the salary of $10,000 paid to Walkup in 1938 and of $5,000 in 1939. A directors' resolution of March 23, 1943, authorizing the $20,000 salary to Walkup, described it "as full compensation for his services for the period ending March 31, 1943"; a similar resolution of March 27, 1944, authorized the second $20,000 salary as "full compensation for his services for its fiscal year ending March 31, 1944." Petitioner has *258 earned the following net incomes (before taxes) and paid the following dividends: Fiscal Year
Net Income
Dividends
1938
$ 3,592.38
1939
21,286.22
1940
22,550.79
$ 7,500.00
1941
19,261.85
1942
21,286.06
1943
29,386.62
15,000.00
1944
29,088.51
15,000.00 Net income was increased by $15,246.32 for 1943 and by $15,552.56 for 1944 by reason of the Commissioner's disallowance of depreciation claimed. Petitioner's balance sheets indicate a continuous rise in assets from $218,027.55 in 1938 to $839,576.37 in 1942. For the taxable years ended March 31, 1943 and 1944, its total assets were carried at $777,354.40 and $756,124.44, respectively; its liabilities included bonds, notes and mortgages payable of $670,911.79 for 1943 and $627,831.26 for 1944. Walkup's personal account with petitioner, to which his salary and dividends were credited, showed a balance in his favor of $13,501.35 on March 31, 1943, and a balance due petitioner of $12,149.21 on March 31, 1944. At times Walkup's indebtedness to petitioner exceeded $40,000, but was normally about half that amount. Reasonable compensation for Walkup's services to petitioner during each of the fiscal years *259 ended March 31, 1943 and 1944 was $10,000. In determining petitioner's tax deficiencies for each of said years, the Commissioner allowed a deduction of $5,000. 2. On or about June 15, 1943, petitioner filed a franchise tax return with the California Franchise Tax Commissioner in which it reported net income for the fiscal year ended March 31, 1943, in the amount of $30,270.13 and a franchise tax liability for the taxable year ended March 31, 1944, based upon its net income for the year ended March 31, 1943, in the amount of $1,210.81. The tax was deducted by petitioner and allowed by respondent in the determination of petitioner's net income for the year ended March 31, 1944. On September 20, 1945, the California Franchise Tax Commissioner issued to petitioner a Notice of Additional Franchise Tax Proposed to be Assessed in which the California Franchise Tax Commissioner proposed to increase petitioner's net income for the year ended March 31, 1943, by the amount of $35,246.32 and proposed to assess additional franchise taxes against petitioner for the year ended March 31, 1944, in the amount of $1,409.85. Petitioner filed a protest against said proposed additional franchise tax and *260 petitioner's actual franchise tax liability for the year ended March 31, 1944, has not been determined. No part of the additional franchise taxes proposed to be assessed against petitioner on its net income for the year ended March 31, 1943, was deducted by respondent in his redetermination of petitioner's net income for the year ended March 31, 1944. On or about June 15, 1944, petitioner filed a franchise tax return with the California Franchise Tax Commissioner in which it reported net income for the fiscal year ended March 31, 1944, in the amount of $30,299.32 and a franchise tax liability based on said net income in the amount of $1,030.17. On September 20, 1945, the California Franchise Tax Commissioner issued to petitioner a Notice of Additional Franchise Tax Proposed to be Assessed in which the California Franchise Tax Commissioner proposed to increase petitioner's net income for the year ended March 31, 1944, by the amount of $35,552.56 and proposed to assess additional franchise taxes against petitioner based upon petitioner's net income for the year ended March 31, 1944, in the amount of $1,208.79. Petitioner filed a protest against the proposed additional franchise tax *261 and petitioner's actual franchise tax liability based upon its net income for the year ended March 31, 1944, has not been determined. No part of the franchise tax based upon petitioner's net income for the year ended March 31, 1944, was deducted by petitioner in its return for the year or by respondent in his redetermination of petitioner's net income for said year. Opinion 1. To justify the annual salary of $20,000 paid to Walkup for the fiscal years 1943 and 1944, petitioner stresses the acumen and perspicacity which he displayed in acquiring and converting dilapidated properties into premises well suited for drayage and warehouse purposes, his financial arrangements in the procuring of funds, the extraordinary growth of business under his management, his proven competence in other businesses, and the corroborating testimony of three expert witnesses that such a salary was reasonable for the services performed and ability displayed. Respondent, admitting Walkup's competence, contends that all the valuable services were rendered in prior years and even then were largely such as to impress compensation for them with the character of a capital expenditure. He emphasizes that during *262 the taxable years petitioner invested only small amounts in minor improvements and a single purchase; that otherwise its business was nothing more than the collection of rents and payment of interest, duties for which under the circumstances the $5,000 allowed was adequate compensation. In considering the issue we have given very earnest consideration to petitioner's three expert witnesses: George H. Thomas, a real estate broker, John Neukom, member of McKenzie & Co., management consultants, and Carl Wente, a vice president of the Bank of America. All three displayed a thorough knowledge of petitioner's business and Walkup's activities; by experience they were qualified to appraise the value of his services, and they all agreed that a salary of $20,000 was proper for the management of an enterprise of petitioner's size. If petitioner's tenants had not been Walkup's other companies and if Walkup had served petitioner alone, we should be inclined to accept their opinion as decisive. But each admitted knowledge of no situation comparable to that existing here, and in determining reasonable salary, we can not ignore Walkup's relation to petitioner and petitioner's tenants, or accept *263 as a proper criterion for our decision the measure of compensation which a normal company, unconnected with its tenants, would pay to a manager who served it alone. In its origin and operation petitioner was a part of Walkup's integrated drayage and warehouse business. Walkup candidly admitted organizing it to acquire properties which his operating companies needed and which they could not acquire without approval of the California Railroad Commission. Professing apprehension that the Commission would be dilatory in granting approval, he formed petitioner on advice of counsel, thereby avoiding the Commission's control. Petitioner's capital of a mere $150 refutes any intention to initiate a separate and independent business, and subsequent operation supports the conclusion that there has never been any such intention. In the purchase and improvement of the Wieland Brewery and all later acquisitions, Walkup's purpose was to acquire properties which his operating companies could use, not properties which petitioner could rent to others. To finance these acquisitions, funds were provided by Drayage and by loans based on Walkup's credit, not petitioner's, for initially petitioner had *264 neither funds nor credit. Apart from three negligible items of income, all petitioner's revenue came from rents paid by Walkup's operating companies. Hence the duties normally inherent in the management of a renting enterprise, such as seeking tenants, procuring the best return possible, collecting rents, etc., were entirely missing. In all such functions there was no party having an adverse interest, and Walkup was free to make such intercompany arrangements as he deemed best. In so doing, he was serving both the lessor and the lessee. Petitioner argues convincingly, however, that the proper maintenance of properties which cost over $800,000 and which had a substantially greater value in the taxable years is a factor of importance in the fixing of the manager's salary, and is at pains to stress Walkup's proven ability in prior purchases and improvements and his intention to expand petitioner's holdings. Such intention is given color by the fact that unspecified additional properties have been acquired since the taxable years. Admitting, as it must, the minor character of the acquisitions and improvements during the taxable years, petitioner argues that such services in prior years *265 should be considered under the doctrine of . To this respondent aptly replies that nothing indicates an intention of compensating Walkup for prior years' services, cf. ; certiorari denied, ; , and adds that in any event compensation for constructions and improvements is not a deductible expense but cost of the properties and hence to be capitalized. ; affd. (C.C.A., 8th Cir.), . As we do not deem the salaries in controversy compensation for prior years' services, it is unnecessary to discuss the second point. It is to be inferred, however, that Walkup was steadily alert for properties needed by the operating companies, and his attention to such opportunities could not be a part of cost. In the exercise of capable judgment he was serving both petitioner and the operating companies, and the same can be said of his attention to maintenance and planning for the future. *266 Witness Neukom testified that a customary fee for the management of leased property is 5 percent of gross rents, which here would be about $7,500, but we agree with him that Walkup's services exceeded those of a manager. He was the directing head of the enterprise. After considering the several imponderable factors which Walkup's relation to petitioner and petitioner's tenants involve and taking into account that the services in controversy can not be allocated by any precise formula between petitioner and the operating companies, we are of opinion and have found that an annual salary of $10,000 is reasonable compensation for services rendered to and on behalf of petitioner during the fiscal years 1943 and 1944. The deduction allowed for each year should accordingly be increased by $5,000. 2. Petitioner charges error in the Commissioner's failure to allow as a deduction for the fiscal year ended March 31, 1944, additional California franchise taxes in the amount of $1,409.85 based on its net income for the fiscal year 1943 and such taxes in the amount of $2,238.96 based on its net income for the fiscal year 1944. Of the latter amount $1,030.17 has been assessed and $1,208.79 is *267 proposed as an addition. Both additions were proposed for assessment by notice of September 20, 1945, sent to petitioner by the California Franchise Tax Commissioner. Petitioner filed a protest against them for each year. No determination of liability has yet been made; the deductions now claimed were not taken on petitioner's tax return, and the issue is "raised to protect petitioner's right to deduct" any additional tax in case any should be assessed. It is thus obvious that the subject of the deduction sought is uncertain both as to liability and amount and is contested. Under such circumstances it may not be allowed as accrued, for as the Supreme Court said in : "It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * *" To the same effect is . See also , involving contested *268 and uncontested liability. Because of a change in the California Bank and Corporation Franchise Tax Act, fixing accrual of the franchise tax "on the last day of the 'income year'," petitioner contends that the tax of $1,030.17, based on net income for the fiscal year 1944 and reported by it, is deductible in that year. This question was decided adversely to petitioner's contention in . No deduction is allowable in the fiscal year 1944. Decision will be entered under Rule 50.